IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

JESSICA NICOLE STOOTS, *et al.*,          )
                                          )
        Plaintiffs,                       )
                                          )
v.                                        )          Civil Action No. 7:22-cv-00196
                                          )
JORDAN SPARTI, *et al.*,                  )          By: Elizabeth K. Dillon
                                          )               United States District Judge
        Defendants.                       )
                                          )

**MEMORANDUM OPINION**

Plaintiffs Jessica Nicole Stoots and John Lewis Phillips, proceeding pro se, filed suit

against three employees of the City of Roanoke, in both their individual and official capacities,

alleging violations of their First, Fourth, Fifth, and Fourteenth Amendment rights in relation to

the removal of their child, "CMP,"[1] at Carilion Roanoke Memorial Hospital in March 2020.  The

amended complaint also contains passing references to the Rehabilitation Act of 1973 in the

factual section (Am. Compl. ¶¶ 4, 7, Dkt. No. 27), but there are no specific claims or causes of

action asserted based on that statute, and the plaintiffs have been fairly specific and clear in

listing their claims.  Thus, the court does not construe the amended complaint as including such a

claim.

Now before the court are defendants' motion to dismiss for failure to state a claim (Dkt.

No. 30), defendants' motion to strike plaintiffs' second opposition brief (Dkt. No. 53), and

plaintiffs' motion for leave to re-file that brief (Dkt. No. 56).  The court held a hearing on the

---

[1] CMP is a minor.

motion to dismiss,[2] and each of these motions is fully briefed and ripe for resolution.  For the following reasons, the court will grant defendants' motion to strike, deny plaintiffs' motion for leave to re-file their second opposition brief, and grant in part and deny in part defendants' motion to dismiss.  The court will deny the motion as to one of the claims against defendants Sparti and Jarvis, but it will otherwise be granted.

## I.  BACKGROUND[3]

In March 2020, Stoots gave birth to CMP.  Phillips is CMP's father.  During her pregnancy, Stoots entered a medication-assisted treatment program to combat a substance abuse disorder and to prevent the infant from being exposed to harmful substances.  She was tested for controlled substances throughout her pregnancy and never tested positive for any drugs except those prescribed to her.

On or about March 9, 2020, the Roanoke City Department of Social Services ("DSS") received a complaint "about Ms. Stoots following doctor's orders."  (Am. Compl. ¶ 3, Dkt. No. 27.)  At that time, Stoots and CMP were patients at LewisGale Medical Center in Salem, Virginia.

On March 11, 2020, Jordan Sparti, a Family Services Specialist with DSS, walked into Stoots' hospital suite "unannounced," without "show[ing] any credentials," "[w]ithout [a] warrant and without a court order" to inquire about the complaint that DSS received.  (*Id.*)  Stoots, CMP, and their doctor "Dr. Keeley" were all in the room.  Plaintiffs allege that there was

---

[2]  At the hearing, the court heard argument on, and subsequently denied on the record, plaintiffs' motions for an "emergency injunction" (Dkt. No. 29) and for summary judgment (Dkt. No. 42).  The court then took the motion to dismiss under advisement.  (*See* Dkt. No. 51.)

[3]  The facts recounted below are drawn from plaintiffs' amended complaint (Dkt. No. 27).  The amended complaint repeatedly notes that Phillips contemporaneously recorded the events described therein; defendants included a CD-ROM copy of Phillips' recording as an exhibit to their opposition brief.  (Exs. A & B, Dkt. No. 31.)  The court construes the recording as having been incorporated into the amended complaint by reference.  *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

2

an active "no patient contact" notice on Stoots' and CMP's hospital room that was supposed to prevent others from entering that room.  According to the amended complaint, Dr. Keeley explained to Sparti that he was the doctor that oversaw Stoots throughout her pregnancy and that it had been a success.  Sparti then told Stoots and Dr. Keeley that "this wasn't going to be a big deal," that "she was glad that her [medication-assisted treatment program] worked," and that there would not be any issues with Stoots taking methadone as advised by her doctor.  Sparti then left the room.  (*Id.* ¶ 5.)  Plaintiffs allege that "there was a conversation between Ms. Sparti and the hospital[4] the day before [the removal of CMP] when Ms. Sparti told them she would be removing the child the next day and to not alert the family at which time the person talking to her obliged." (*Id.* ¶ 4.)

At approximately 10:15 a.m. on March 13, 2020, Sparti walked into Stoots' and CMP's hospital suite—now at Carilion Roanoke Memorial Hospital.  (*Id.* ¶ 6.)  She was joined by Allyson Jarvis, a Senior Family Services Specialist with the Department.  Phillips was also present.  Upon entering the room, Sparti introduced herself as "Jordan" and noted that she had seen Stoots over the prior weekend but had not yet met Phillips.  (Ex. A, Dkt. No. 31.)  Sparti noticed CMP, and Phillips stated that CMP had lost weight since being born.[5]  Phillips asked Sparti why she was in their hospital suite.  Sparti responded that she was there because Stoots and CMP had tested positive for methadone and that, "as far as allegations go," CMP is a "substance-exposed infant."  Sparti asked if Phillips was recording the conversation; Phillips said he was not.  (*Id.*)

---

[4]  Sparti had spoken to a nurse at Carilion Roanoke Memorial.  (Am. Compl. ¶ 42.)

[5]  In their briefing, defendants emphasize that CMP had lost weight, but the amended complaint does not allege that Sparti or Jarvis ever gave told plaintiffs that the baby's weight loss was a reason for the removal. Further, the court recognizes that weight loss after birth is common.  In fact, "[a] healthy newborn is expected to lose 7% to 10% of the birth weight, but should regain that weight within the first 2 weeks or so after birth." Nemours Kids Health, *Your Newborn's Growth*, https://kidshealth.org/en/parents/grownewborn.html (last visited September 29, 2023).

Sparti said that Stoots had told her over the prior weekend that she "didn't have any CPS [Child Protective Services] history."  Sparti then asked her, "how come you lied to me?"  (Ex. A, Dkt. No. 31.)  Stoots indicated that she did not know what Sparti was talking about and stated that she wanted an attorney before speaking to Sparti further.  Phillips likewise stated that the couple would not talk to anyone from CPS without attorneys present.  Stoots then acknowledged that a nurse at LewisGale had called CPS in relation to CMP; she recalled that the head nurse did not know why one of the nurses called CPS and that the nurse was trying to figure out "what lines were crossed there" and why CPS was involved.  Sparti suggested it was "because [Stoots and CMP] tested positive for methadone."  Stoots responded that she had taken methadone as part of the treatment program "that is legal in the state of Virginia."  Sparti replied that CMP was "still substance exposed."

Sparti asked whether Stoots or Phillips would speak to her without lawyers present.  Both said they would not.  Phillips reiterated that their declining to speak with Sparti was "nothing against [her]," but rather was based on the very negative experiences that the couple had with workers from CPS in the past.  Sparti then asked Phillips to "tell [her] what happened, then."  Phillips began to explain that Child Protective Services had previously taken their first son away several times on the belief that Stoots had used illicit substances when, in reality, the drugs were prescribed to her.

Sparti asked whether Stoots and Phillips would agree to take a drug test for her today.  Phillips responded that he would not, and that he would not do anything for Sparti unless his attorney told him to do so.  Sparti asked whether the couple had an attorney—Phillips said they did.  Sparti asked whether Phillips was going to call the attorney.  Phillips responded that they did not need to call an attorney, and then asked Sparti what she wanted to know.  Sparti stated that, "based on history and everything that's going on," she would need both Stoots and Phillips

4

to take a drug test and a mental health assessment and that, until they did so, CMP would need to be placed somewhere else. Phillips told Sparti to "have a good day" and that the couple would talk to her when they had an attorney present. Sparti asked if there was anyone with whom the couple could place CMP. Phillips responded that there was nobody nearby for them to place her with and that CMP would not be going to foster care. Sparti then left the room.

At some time thereafter, Sparti told Phillips that since the couple was not willing to comply, she would be executing a removal of CMP into DSS custody. Phillips asked why. Sparti responded that CMP was being removed because the couple was not willing to speak with her. Phillips clarified that they would be willing to speak with her if an attorney was present. Sparti asked if their attorney was coming. Phillips stated that Stoots was on the phone with an attorney.

Sparti stated again that CMP would be taken into DSS custody. Phillips said "not yet" and asked to see "the paperwork." Sparti responded that she did not have any paperwork yet but that she had the right to remove CMP without paperwork as a Child Protective Services worker. At that point, Jarvis interjected to state that she was Sparti's superior/senior worker, that Carilion police were present, and that they would be executing an emergency removal of CMP. Phillips stated that nobody would be touching CMP without paperwork. He addressed the Carilion police officer and reiterated his view that nobody could take CMP without paperwork. The officer stated that Sparti and Jarvis were following the proper process. Jarvis again said that Child Protective Services would be effecting an emergency removal of CMP, "which is paperless." Phillips questioned on what basis they would be removing CMP. Jarvis stated that Sparti had given the couple the option to make a placement for CMP when speaking with them earlier but they did not do so and claimed that the couple had lied to Sparti about "past CPS history" and were not truthful about past drug use. Stoots and Phillips denied those allegations

5

and claimed that Jarvis was lying.  Phillips again asked to see paperwork and insisted that it must be signed by a judge.  The officer interjected and stated that it would not need to be signed by a judge.  Phillips disagreed.  The officer insisted that the couple get their attorney on the phone.

Sparti provided Phillips with a paper copy of a notice of emergency removal of CMP. Phillips nevertheless refused to comply and claimed the notice was not legally binding.  Phillips and the police officer continued to exchange words—the officer repeatedly stating that he would be removing CMP and Phillips responding that he would not allow him to do so.  Jarvis then notified the couple that, because CMP would be taken into foster care, any visitation of CMP would have to be supervised and at the direction of the Department of Social Services until further notice.  Phillips continued to resist, accusing the officials present of kidnapping CMP.

Eventually, Sparti (with the help of the Carilion police officers) removed CMP from plaintiffs.  Stoots laid CMP down in her bassinet to rest, and a member of the hospital staff then grabbed her and left the room.  (Am. Compl. ¶ 36.)

Shortly after leaving the hospital, Sparti obtained an emergency removal order from the Juvenile and Domestic Relations District Court ("J & D court").  (*See* Dkt. No. 31-1 (emergency removal order); Am. Compl. ¶ 41.)[6]  Plaintiffs allege that Sparti lied in the affidavit she submitted to obtain that order.  (Am. Compl. ¶ 41.)  On March 17, 2020, the J & D court held a hearing at which that court found that there was probable cause for the removal.  (*See* Dkt. No.

---

[6]  The court can consider the copies of the orders attached to defendants' motion to dismiss because they are integral to plaintiffs' allegations that Sparti obtained an emergency removal order from the J & D court and that the court held a hearing days later.  *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (providing that a court may "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity").  Although plaintiffs undoubtedly disagree with the legal conclusions reached by the J & D judge and the facts alleged by Sparti to obtain the judge's orders, they do not dispute that the exhibits attached to defendants' motion are indeed authentic copies of those orders.  Accordingly, the court can consider the orders for their existence without assuming the truth of any factual matter contained therein.  *See id.* at 167 ("[W]here the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true.").

31-2.)  On April 9, 2020, the J & D court held a hearing and made the determination that CMP should be returned to plaintiffs.  (*See* Am. Compl. ¶ 55; Dkt. No. 31-2.)  Custody of CMP was then returned to plaintiffs.

On April 6, 2022, plaintiffs filed this suit against Sparti, Jarvis, and Donald Goss (a supervisor with Child Protective Services), in both their official and individual capacities, asserting violations of the First, Fourth, Fifth, and Fourteenth amendments.  (Compl., Dkt. No. 1.)  After plaintiffs filed an amended complaint (Dkt. No. 27), defendants moved to dismiss the complaint in its entirety for failure to state a claim (Dkt. No. 30).

## II.   LEGAL STANDARDS

### A.  Liberal Construction of Pro Se Filings

When a pro se litigant files a document, that filing is "to be liberally construed."  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  "[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  *Id*. (internal quotations omitted); *cf*. Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice.")  What this means is that "if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so, but a district court may not rewrite a petition to include claims that were never presented."  *See Pinckney v. Ozmint*, 490 F. Supp. 2d 670, 675 (D.S.C. 2007) (citing cases).  In other words, courts may not "construct a party's legal arguments for [him or her]," *Small v. Endicott*, 998 F.2d 411, 417–18 (7th Cir. 1993) or "conjure up questions never squarely presented to them," *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

### B.  Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations must "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This

standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the

plaintiff has stated a claim entitling him to relief, i.e., the 'plausibility of entitlement to relief.'"

*Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).  The

plausibility standard requires more than "a sheer possibility that a defendant has acted

unlawfully." *Iqbal*, 556 U.S. at 678.  Although Rule 8(a)(2) requires only a "short and plain

statement of the claim showing that the pleader is entitled to relief," "a formulaic recitation of

the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

In deciding the motion, the court must accept as true all well-pleaded facts in the

complaint and in any documents incorporated into or attached to the complaint.  *Sec'y of State

for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  Further, it must

"draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards v.

City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but it need not "accept legal conclusions

couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United

States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (internal

quotations omitted).

## III.  ANALYSIS

### A.  Defendants' Motion to Strike Plaintiffs' Second Response Brief (Dkt. No. 53); Plaintiffs' Motion for Leave to Re-File the Response Brief (Dkt. No. 56)

After oral argument on the motion to dismiss and without first obtaining leave of court,

plaintiffs filed a second brief in opposition to defendants' motion to dismiss.  (Dkt. No. 52.)

Defendants now move to strike that brief as violative of this court's Local Rules.  Plaintiffs

responded to the motion (Dkt. No. 54) and, shortly thereafter, moved for leave to re-file the

second opposition brief (Dkt. No. 56).

"For those motions [filed in this court] that are to be briefed, generally there are to be no more than three briefs: (1) the movant's supporting brief, which is to accompany the motion, (2) the nonmovant's opposition brief, and finally (3) the movant's reply brief." *See Sutherlin v. Smith*, No. 4:15–cv–00037, 2016 WL 676581, at *1 (W.D. Va. Feb. 17, 2016) (citing W.D. Va. Civ. R. 11(c)(1)). After that briefing is complete, "[n]o further briefs (including letter briefs) are to be submitted without first obtaining leave of court." *See* W.D. Va. Civ. R. 11(c)(1). Plaintiffs exceeded this limitation by filing a second brief in opposition to the motion to dismiss. Regardless of whether that brief "is necessary for a complete understanding of the case," "prejudice[s] the defendant,"[7] or "promotes the interests of justice" (Dkt. No. 54 at 1–2), those considerations do not relieve plaintiffs of their collective obligation to comply with Local Rule 11. Even plaintiffs' response brief to the motion to strike was untimely; the Local Rules require any response brief to a motion to be filed with 14 days of service, yet plaintiffs did not respond to that motion for 45 days. Lastly, if plaintiffs' second opposition brief only provides "clarification of the original arguments" (Dkt. No. 56 at 1), the court finds that such clarification is unnecessary, given the other briefs and oral argument on the motion to dismiss. And to the extent the second response brief offers new arguments not previously addressed either in plaintiffs' first response brief or at oral argument, plaintiffs have not demonstrated good cause to file it now.

Litigating a case in federal court as a pro se party is undoubtedly challenging. The court acknowledges that plaintiffs likely did not intend to violate any procedural rules regarding the

---

[7] Even still, considering plaintiffs' second opposition brief would indeed prejudice defendants because the brief was filed after oral argument on the motion to dismiss, meaning defendants had no opportunity to respond to it (while still complying with the Local Rules) either in writing or at oral argument. *See, e.g.*, *Magnate, LLC v. EPA*, No. 5:22-cv-00040, 2023 WL 4169961, at *4 (W.D. Va. June 26, 2023) (denying motion to strike the plaintiff's surreply brief, which was filed before oral argument on the underlying motion, because the plaintiff "could just as easily have presented the arguments contained in the surreply at oral argument").

mode and timing of motion briefing.  But the Supreme Court has made clear that even pro se litigants must follow rules of civil practice and procedure.  *McNeil v. United States*, 508 U.S. 106, 113 (1980); *see Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809–10 (7th Cir. 2005) (recognizing a district court may ignore and not consider additional facts a litigant proposes in violation of court orders or rules of procedure).  Accordingly, the court will grant defendants' motion to strike plaintiffs' second response brief and deny plaintiffs' motion for leave to re-file it.[8]

### B.  Defendants' Motion to Dismiss for Failure to State a Claim (Dkt. No. 30)

Prior to addressing the merits of plaintiffs' constitutional claims, some background on the law governing emergency removal of a child in Virginia is helpful to understanding defendants' alleged role in the events that led to this case.

### 1.  Procedure for emergency child removal under Virginia law

Virginia Code § 63.2-1517 permits a physician, a CPS worker, or a police officer to take custody of a child, for up to 72 hours, prior to obtaining a court order and without prior approval of the child's parent or guardian.  *Parker v. Austin*, 105 F. Supp. 3d 592, 597 (W.D. Va. 2015). Emergency removals are the exception and only proper when all of the following conditions are met:

1. the circumstances of the child are such that continuing in his place of residence or in the care or custody of the parent . . . presents an imminent danger to the child's life or health to the extent that severe or irremediable injury would be likely to result or if evidence of abuse is perishable or subject to deterioration before a hearing can be held;

2. A court order is not immediately obtainable;

3. The court has set up procedures for placing such children;

---

[8]  Even if the court considered plaintiffs' second response brief, the court's decision on the motion to dismiss would be the same.

4. Following taking the child into custody, the parents or guardians are notified as soon as practicable . . . .;

5. A report is made to the local department; and

6. The court is notified and the person or agency taking custody of such child obtains, as soon as possible, but in no event later than 72 hours, an emergency removal order pursuant to § 16.1–251 . . . . Any person or agency petitioning for an emergency removal order after four hours have elapsed following taking custody of the child shall state the reasons therefor pursuant to § 16.1–251.

*Id.* (quoting Va. Code § 63.2-1517(A)(1)–(6)).

A social worker's determination that a "child is subject to imminent danger to his life or is in imminent danger of irreparable injury to his health is a sharply focused factual determination essentially free of the kind of subjective judgments that are peculiarly susceptible to error . . . ." *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 347 (4th Cir. 1994). That determination "can readily and accurately be made by a physician or adequately trained DSS worker," unlike "the legal determinations of probable cause necessary for civil [asset] forfeiture," for the "typically complex determination of welfare entitlement," or for "parental fitness." *Id.* (collecting cases). "Thus, emergency removal is 'arbitrary and abusive' if there is no reason to believe a child is being abused or in imminent danger of harm but warranted if there is 'some evidence of child abuse' or a reasonable basis to suspect the child is in immediate danger of serious harm.'" *Parker*, 105 F. Supp. 3d at 597 (quoting *Martin v. St. Mary's Dep't. of Soc. Servs.*, 346 F.3d 502, 512 (4th Cir. 2003) (Traxler, J., dissenting); *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391–92 (4th Cir. 1990)).

After taking emergency custody of a child and upon filing an emergency removal petition ex parte, the J & D judge must find probable cause, supported by affidavit or sworn testimony, that:

1. The child would be subjected to an imminent threat to life or health to the extent that severe or irremediable injury would be likely to result if the child were returned to or left in the custody of his parents, guardian, legal custodian, or other person standing in loco parentis pending a final hearing on the petition.

2. Reasonable efforts have been made to prevent removal of the child from his home and there are no alternatives less drastic than removal of the child from his home which could reasonably protect the child's life or health pending a final hearing on the matter.

*Parker*, 105 F. Supp. 3d at 597–98 (citing Va. Code § 16.1–251(A)(1)–(2)).

**2. Individual-capacity claims against Donald Goss**

Plaintiffs named Goss as a defendant in this action, but the amended complaint barely mentions him and does not describe anything (let alone anything unlawful) that he did with respect to the removal of their daughter.  Plaintiffs claim that "[a]ccording to D.S.S. case files there was a conversation between Ms. Sparti and the hospital the day before when Ms. Sparti told them she would be removing the child the next day and to not alert the family at which time the person talking to her obliged.  This meant that Ms. Sparti, *Mr. Goss*, and Ms. Jarvis were all operating in bad faith by knowing they were going to affect an emergency removal that day . . . ."  (Am. Compl. ¶ 4 (emphasis added).)  The only other context in which Goss' name appears is the conclusory allegation that "*Mr. Goss*, Ms. Sparti and Ms. Jarvis knew they were breaking the law and chose to carry through with it anyway."  (*Id.* ¶ 8 (emphasis added).)

Plaintiffs assert myriad constitutional claims—all pursuant to 42 U.S.C. § 1983—against Goss in both his individual and official capacities.  In official-capacity § 1983 claims, the government entity's "'policy or custom' must have played a part in the violation of federal law." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  On the other hand, "to establish *personal* liability in a § 1983 action, it is

enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky*, 473 U.S. at 166 (emphasis in original).

Here, the negligible allegations against Goss in the amended complaint fail to state either type of claim. Plaintiffs do not allege that Goss played any role in the removal itself or was otherwise involved in the events at issue. Instead, it appears that they are seeking to hold Goss liable simply because he supervised Sparti and Jarvis. But they have not alleged any facts to establish a supervisory liability claim. *See Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (explaining that, to state such a claim, a plaintiff must allege facts sufficient to show that (1) the defendant "had actual or constructive knowledge that [a] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) the defendant's "response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'"; and (3) there was an "affirmative causal link" between the defendant's conduct and plaintiff's "particular constitutional injury." (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). Because plaintiffs have not adequately alleged that Goss was personally involved in these events and have not alleged facts to support a supervisory liability theory of recovery, all individual-capacity claims against Goss must be dismissed.

### 3.  Official-capacity claims against all defendants[9]

As for the official capacity claims against Goss and the other defendants, such claims are effectively claims against the entity for which they work. *Kentucky*, 473 U.S. at 165 ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell*, 436 U.S. at 690 n.55).) But there is no

---

[9] The parties did not fully brief the merits of the official-capacity claims, but defendants sought dismissal of all claims against them.

allegation that the defendants were acting according to DSS custom or policy or that any deprivation suffered by plaintiffs was caused by such a custom or policy, as is required to state such a claim.  In the absence of such allegations, plaintiffs have failed to state an official-capacity claim against any of the defendants.  Accordingly, the court will grant the motion to dismiss all official-capacity claims against all defendants.

### 4. Sparti and Jarvis did not violate the Fourth Amendment by entering Stoots' hospital room.

Plaintiffs first claim that Sparti and Jarvis violated their Fourth Amendment rights by entering Stoots' hospital suite without a warrant.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Supreme Court has held that "the Fourth Amendment protects people, not places."  *Katz v. United States*, 389 U.S. 347, 351 (1967).  Thus, a search under the Fourth Amendment occurs only when the government invades a person's "constitutionally protected reasonable expectation of privacy."  *Id*. at 360–61 (Harlan, J., concurring).  In examining a Fourth Amendment unreasonable search claim, the court must determine whether there is a reasonable expectation of privacy in the area searched, and if so, whether the search is reasonable.  *See United States v. Rusher*, 966 F.2d 868, 873–74 (4th Cir. 1992).  "In order to demonstrate a legitimate expectation of privacy, [plaintiffs] must have a subjective expectation of privacy," *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010), and that subjective expectation of privacy must be "objectively reasonable; in other words, it must be an expectation that society is willing to recognize as reasonable," *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011) (internal quotation marks omitted).

14

Although the court does not doubt plaintiffs' subjective expectation of privacy in the hospital suite,[10] the asserted expectation of privacy in this instance is not objectively reasonable. "Although a hospital patient retains some level of privacy in," for example, "a hospital emergency room, it is much less than that enjoyed in one's home." *United States v. Davis*, 657 F. Supp. 2d 630, 637 (D. Md. 2009); *see also Craft v. Commonwealth*, 269 S.E.2d 797, 800 (Va. 1980) ("A person admitting h[er]self to an emergency room has little expectation of privacy."). The court recognizes that the level of privacy one might expect in an individual birthing suite, or personal treatment room, is likely higher than the level of privacy one might reasonably expect in an emergency room. *See United States v. Clancy*, 979 F.3d 1135, 1139 (6th Cir. 2020) (collecting authority as to whether patients have a reasonable expectation of privacy in hospital rooms and noting that any such expectation was less reasonable in an emergency room); *United States v. New*, 491 F.3d 369, 374 n.3 (8th Cir. 2007) (noting the "division of authority on whether a patient has a reasonable expectation of privacy in a hospital room" and collecting authority); *see also, e.g.*, *Birge v. Med. Elec. Distributors, Inc.*, No. 075000540, 2009 WL 1959393, at *6 (Conn. Super. June 5, 2009) ("[T]he plaintiff had a reasonable expectation that no one other than medical personnel would be present in her treatment room . . . .").

But notably, the individuals here who were entering the room, Sparti and Jarvis, were acting in an investigative capacity. Even in the context of the home—where one's expectation of privacy is greatest—the Fourth Circuit has held that "investigative home visits by social workers are not subject to the same scrutiny as searches in the criminal context." *Wildauer v. Frederick Cnty.*, 993 F.2d 369, 372 (4th Cir. 1993) (citing *Wyman v. James*, 400 U.S. 309, 318 (1971)).

---

[10] Plaintiffs' amended complaint extensively describes their subjective rationale for expecting privacy in their hospital suite from all visitors, including government workers. (*See* Am. Compl. ¶¶ 3 (noting the "no patient contact" notice on the hospital room at LewisGale), 6 ("One has to assume that a hospital birthing suite raises a reasonable expectation of privacy if not a heightened expectation of privacy given what goes on in there and who it houses, our most precious cargo.").)

Similarly, the Fourth Circuit has recognized that a police officer "lawfully fulfilling his duty to investigate a reported shooting . . . lawfully entered the emergency room of a hospital to interview the victim of the shooting." *United States v. Davis*, 690 F.3d 226, 234 n.13 (4th Cir. 2012).

Here, Sparti entered Stoots' hospital suite at LewisGale in response to a complaint that Stoots had not followed doctors' orders (*see* Am. Compl. ¶ 3), and both Sparti and Jarvis entered the hospital suite at Carilion Roanoke to follow up on a report that CMP and Stoots had tested positive for methadone (*id.* ¶ 7). In other words, defendants made both visits in an investigative capacity. Although plaintiffs allege that there was a "no patient contact" notice in place while they were at LewisGale (though it is unclear whether the same was in place at Carilion Roanoke), that sort of notice would not ordinarily prevent DSS officials from entering a hospital room to investigate a matter or execute the removal of a child. In sum, plaintiffs had no objectively reasonable expectation of privacy in the hospital room from CPS workers acting in an investigative capacity. Accordingly, defendants did not violate their Fourth Amendment rights by entering either hospital room.

### 5. Plaintiffs may not bring a Fourth Amendment claim for the seizure and emergency removal of CMP.

Plaintiffs also allege that defendants violated the Fourth Amendment by removing CMP without a prior court order. Importantly, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). As such, since CMP was the only individual seized and she is not a plaintiff in this action,[11] the parent-plaintiffs cannot assert a claim for violation of the

---

[11] Plaintiffs purport to vindicate CMP's Fourth and Fourteenth Amendment rights as described in the amended complaint's "Causes of Action," but she is not named as a party-plaintiff, nor does the style of the case indicate that claims are being brought on her behalf by either plaintiff. (*Compare* Am. Compl. 16 *with id.* at 1.)

Fourth Amendment on her behalf.  *See Gedrich v. Fairfax Cnty. Dep't of Family Servs.*, 282 F.

Supp. 2d 439, 468–69 (E.D. Va. 2003); *Parker*, 105 F. Supp. 3d at 598 (dismissing parents'

Fourth Amendment claim for removal of children because it could only be brought by the

children themselves).  Thus, plaintiffs' claims of a Fourth Amendment violation for the seizure

of CMP must be dismissed.

The court further notes that, even if CMP had been included as a plaintiff in the case, the

precise standard applicable to Fourth Amendment unlawful seizure claims in the child removal

context was not clearly established at the time alleged in the amended complaint.  Indeed, the

Fourth Circuit "has 'not articulated the legal standard that applies to Fourth Amendment

unlawful seizure claims in the child removal context.'"  *Rogers v. Cumberland Cnty. Dep't of*

*Soc. Servs.*, No. 5:20-CV-477-BO, 2022 WL 1132153 (E.D.N.C. Feb. 1, 2022), at \*11 (quoting

*Parker v. Henry & William Evans Home for Children*, 762 F. App'x 147, 155 (4th Cir. 2019)),

*report and recommendation adopted*, 2022 WL 851730, at \*5 (E.D.N.C. Mar. 22, 2022).  In

*Parker*, the Fourth Circuit noted that the majority of other circuits to consider the question—the

Seventh, Ninth, and Tenth Circuits—had concluded that officials may seize a child from her

parents without a judicial order or parental consent only where officials have reasonable cause to

believe that imminent harm to a child does not leave sufficient time to obtain judicial

authorization prior to the removal.  S*ee* 762 F. App'x at 155 (citing cases).[12]  By contrast, the

Second and Fifth Circuits had employed "probable cause"[13] and "totality of the circumstances"[14]

approaches, respectively.  *See id*. (citing cases).  The *Parker* court determined that the defendants

---

[12]  *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 790 (9th Cir. 2016); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1242 (10th Cir. 2003); *Xiong v. Wagner*, 700 F.3d 282, 291–92 (7th Cir. 2012).

[13]  *Southerland v. City of New York*, 680 F.3d 127, 157–58 (2d Cir. 2012) (citing *Tenenbaum v. Williams*, 193 F.3d 581, 605 (2d Cir. 1999)).

[14]  *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 429 (5th Cir. 2008).

were entitled to qualified immunity because the applicable standard was not clearly established at the time of the defendants' conduct, so it did not ultimately adopt any one of those tests. *See id.* The court follows the same approach here. Even if the court were to construe the amended complaint as asserting a claim on CMP's behalf, then, the court concludes that Sparti and Jarvis are entitled to qualified immunity as to the Fourth Amendment claim against them.

For these reasons, Fourth Amendment claims based on CMP's removal from the hospital room must be dismissed.

### 6. Plaintiffs have adequately alleged a Fourteenth Amendment violation against Sparti and Jarvis.

The sole claim that the court concludes survives the motion to dismiss is plaintiffs' Fourteenth Amendment claim against Sparti and Jarvis. As described in the amended complaint, plaintiffs assert Fourteenth Amendment substantive due process claims based on their rights to custody of their child. The Fourth Circuit has explained the importance of such a right:

> The Supreme Court has consistently affirmed that the "interest of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests recognized." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). This fundamental right, however, is not absolute. We have repeatedly held that where officials remove a child from the parents' custody for the child's protection, only an "abuse of power which 'shocks the conscience' creates a substantive due process violation." *Wolf v. Fauquier Cnty. Bd. of Supervisors*, 555 F.3d 311, 322 (4th Cir. 2009) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)); *see D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016); *Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 391–92 (4th Cir. 1990).
>
> . . . In cases such as this involving the warrantless removal of children, the emergency removal does not shock the conscience when it is "based upon *some evidence* of child abuse." *Weller*, 901 F.2d at 391–92 (emphasis added).

*Parker*, 762 F. App'x at 156.

Applying those standards to the facts before it, the *Parker* Court affirmed the district court's dismissal of the plaintiffs' due process claims—claims, like here, based on the emergency removal of plaintiffs' children upon suspicion of child abuse.  In particular, the appellate court reviewed the facts alleged in the complaint and explained that there was some evidence of child abuse and that the actions of the defendants did not shock the conscience.  The *Parker* court noted the following facts in support of its determination: (1) the DSS defendants had received a complaint from an emergency room physician and another social worker concerned that the children were at risk of harm and expressing their belief that plaintiff had a mental illness that could compel her to harm her children; (2) before removal, the DSS defendants attempted two home visits and called the children's aunt, who would not give information regarding their location; and (3) the children had been to several hospitals and had no apparent medical reasons for their symptoms.  All of this evidence was consistent with the theory of another defendant, a DSS case worker in another county, that the mother was suspected of having Munchausen Syndrome by Proxy, an illness in which the sufferer may falsify symptoms of her children or intentionally cause her children to become ill to gain the sympathy or attention of others.  *Id.* at 151, 156–57.

Here, and accepting the facts in the amended complaint as true, as the court must at this stage, the court cannot agree that Sparti and Jarvis had "some evidence" of abuse.  According to the amended complaint, the removal of CMP was predetermined before Sparti and Jarvis arrived on Sparti's second visit.  Specifically, the day before Sparti removed CMP, she advised someone at the hospital she intended to do so.  At that point, the only basis for believing there was abuse of CMP was that CMP and Stoots had tested positive for methadone.  But any value of this drug test as "evidence of child abuse" is eviscerated by Sparti's prior conversation with Stoots' physician.  Specifically, Sparti was present when, on March 11, 2021, Stoots explained—and

19

Stoots' physician confirmed—that Stoots had been prescribed the drugs found in her and CMP's system as part of her medication-assisted treatment program.  Thus, Sparti knew that the positive drug test was not evidence of abuse.

Sparti and Jarvis also gave other reasons for the removal, but the bases for these reasons occurred *after* the removal decision had been made, according to the amended complaint. Moreover, plaintiffs deny most of the other reasons given for the removal.  For example, Sparti accused Stoots and Phillips of "lying" to her about their prior history with CPS.  But the amended complaint alleges that Phillips had never met or talked to Sparti before, so he had not lied about anything.  Phillips did admit during the conversation with Sparti that CPS had previously removed a child from their care, although he insisted the removal was improper.[15]  He claimed the removal was done on the basis of he and Stoots using drugs, but that Stoots had in fact been prescribed the drugs in her system.  The only other possible reasons offered for removal were that Stoots and Phillips refused to take a drug test at that moment and that they did not want to talk with Sparti further without their attorney present.  Without more, the court cannot find that these facts support the conclusion that there was "evidence of some abuse" of CMP.  And even if the positive drug screen was "some evidence" of abuse by Stoots (a conclusion undermined entirely by Sparti's prior advisement from Stoots' physician), there is nothing in the record allowing the court to conclude that there was evidence that *Phillips* had engaged in any abuse of CMP.

The court also notes that the circumstances here were quite unlike those in *Parker*, where the defendants had attempted without success to make two home visits and where the children's

---

[15] Phillips expressed as much in the recording, although the amended complaint itself states that "anything and everything that happened with another child was all voluntary" and that plaintiffs had never "had a child removed from their custody against their will."  (Am. Compl. ¶¶ 15–16.)

location was being hidden from them.  The children were removed from their parents' home after those events.  Here, the complaint does not allege that any investigation was done, nor is there any allegation that plaintiffs had attempted to hide CMP from the DSS workers.  Additionally, CMP was in the hospital with her parents, surrounded by medical personnel who could observe and care for her.  This undercuts any suggestion that there was a threat of imminent harm (as required for an emergency removal under the Virginia statute) or that immediate removal was necessary.

Upon all of the evidence, and at this stage of the case, then, the court concludes that a Fourteenth Amendment due process claim against Sparti and Jarvis has been adequately pled.[16]

The court also considers whether either of these defendants would be entitled to qualified immunity on this claim.  As to both of them, the law was clearly established that, at a minimum, some evidence of abuse was required for an emergency removal.  However, the allegations in the complaint do not support that they could have believed they had some evidence of child abuse. Based solely on the facts in the complaint, then, they are not entitled to qualified immunity.

### 7. Plaintiffs have failed to adequately plead a malicious prosecution claim against Sparti or Jarvis.

The amended complaint makes several references to malicious prosecution.  In the Fourth Circuit, a malicious prosecution claim brought under § 1983 "is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort."  *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (quoting *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000)).  "To state such a claim, a plaintiff must allege that the

---

[16] It is possible, of course, that plaintiffs' denials were false or that they refused to take a drug test because they recently had been using illegal drugs.  Likewise, there may have been other reasons or other information that Sparti knew that caused her to be concerned about abuse of CMP.  So, the summary judgment record may look quite different.  But at this point, no such information is in the amended complaint.

defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by

probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Id.*

As to this claim, the court concludes that it has not been adequately pled. First of all, the

removal petition that was part of the judicial process was granted approved by the court, and the

J & D court itself ruled that there was probable cause for CMP's removal. A plaintiff's

malicious prosecution claim fails if he cannot prove a lack of probable cause. *See Evans*, 223

F.3d at 261. Further, it does not appear from the amended complaint that there was a favorable

resolution of the proceedings. On the one hand, plaintiffs allege that their daughter was returned

to them after thirty days, and "the investigation was deemed unfounded." (Am. Compl. ¶ 55.)

But they also acknowledge that "for reasons unexplained the judge ordered the investigation to

continue" and plaintiffs were required "to take classes, drug tests, mental health evaluations, and

strict counseling." (*Id.*, ¶¶ 56, 59.) This suggests that although they eventually regained

custody, it was not a clear favorable resolution (not any indication that probable cause or

evidence was lacking), but only occurred because plaintiffs satisfied additional requirements

imposed by the court.

Because plaintiffs have not plausibly alleged each element of a malicious prosecution

claim based on actions of Jarvis or Sparti, these claims will be dismissed.[17]

### 8. Sparti and Jarvis did not violate either plaintiff's Fifth Amendment right to counsel.

Plaintiffs also claim that Sparti and Jarvis violated their Fifth Amendment rights by

continuing to converse with and question them after they indicated they would not speak to

anyone from Child Protective Services without an attorney present. The complaint alleges that

---

[17] Malicious prosecution claims arising from defendants' actions in filing the removal petition in the subsequent judicial process are also barred by absolute immunity. *See infra* Section III-B-9.

"Ms. Sparti [said] since you guys will not speak to me with a lawyer present then she will remove the child" (Am. Compl. ¶ 12), but that "[t]his was never the case because it [wa]s repeated several times that we just wanted our lawyer present before we talked to Ms. Sparti harmless exercising our right to coun[sel] when interviewed by a government official" (*id.* ¶ 13). Plaintiffs insist that, "[g]iven the rapid progression of the situation there was never any adequate time given . . . to successfully contact a lawyer.  They kept on giving permission to contact a lawyer but [were] not slowing down the process of removal to allow them to do so."  (*Id.* ¶ 22.)

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const., Amend. V.  The Self-Incrimination Clause privileges a person "not to answer official questions put to him [or her] in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him [or her] in future criminal proceedings."  *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (internal quotations omitted).  To safeguard this right, in *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court adopted a series of procedural rules that must be followed during custodial interrogations. One such safeguard recognized in *Miranda* is that law enforcement must advise a suspect of his or her right to counsel, and "[i]f the individual states that he [or she] wants an attorney, the interrogation must cease until an attorney is present," unless the person "initiates further communication, exchanges, or conversations with [law enforcement]."  *Miranda*, 384 U.S. at 474; *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

Plaintiffs' allegations fail to state a Fifth Amendment claim for numerous reasons.  Most prominent among them, however, is that a violation of the right to counsel recognized in *Miranda*—even assuming one somehow occurred here—does not give rise to a § 1983 claim. Section 1983 provides a cause of action against any person acting under color of state law who

"subjects" a person or "causes [a person] to be subjected . . . to the deprivation of any rights, privileges, or immunities *secured by the Constitution and laws*."  42 U.S.C. § 1983 (emphasis added).  And the "procedural safeguards" required by *Miranda* are "not themselves rights protected by the Constitution;" rather, they are judicially crafted "measures to [e]nsure that the right against compulsory self-incrimination was protected" to "provide practical reinforcement for the right against compulsory self-incrimination."  *Michigan v. Tucker*, 417 U.S. 433, 444 (1974).  Importantly, the Supreme Court quite recently reiterated that "a violation of *Miranda* is not itself a violation of the Fifth Amendment" and declined to "expand[] *Miranda* to confer a right to sue under § 1983."  *See Vega v. Tekoh*, 597 U.S. ---, ---, 142 S. Ct. 2095, 2108 (2022).  As such, to the extent plaintiffs attempt to assert a Fifth Amendment § 1983 claim due to burdens placed upon *Miranda* rights, the court will dismiss that claim.

   **9.   Sparti is entitled to absolute immunity from any First, Fourth, or Fourteenth Amendment claims arising from her filing of the removal petition, and plaintiffs make no factual allegations against Jarvis as to those claims.**

Lastly, affording the complaint a liberal construction, plaintiffs assert various violations of the First Amendment (right to intimate association), Fourth Amendment (malicious prosecution/abuse of process), and Fourteenth Amendment (substantive-due-process right to the custody of their child) in relation to the continued removal of CMP and allegations that Sparti lied in the affidavit filed with the J & D court.

With respect to Jarvis, plaintiffs do not allege any individual involvement in filing/preparing the removal petition or generally in CMP's case at any time after she accompanied Sparti to the hospital on March 13, nor do they allege any institutional role she would have played in the same.  Thus, those claims must be dismissed to the extent brought against her.

With respect to Sparti, public officials (such as social workers) are entitled to absolute immunity for conduct that could be deemed *prosecutorial* and—as discussed earlier—may be entitled to qualified immunity for *investigative* conduct. *Vosburg v. Dep't of Soc. Servs.*, 884 F.2d 133, 138 (4th Cir. 1989); *Evans v. Perry*, 578 F. App'x 229, 232 (4th Cir. 2014). Courts granting social workers absolute immunity "employ a 'functional approach' that examines the particular wrongs the defendant is alleged to have committed. That is, these courts look to the particular task the social worker performed and its nexus to the judicial process rather than deciding that social workers as a class are entitled to absolute immunity." *Sahoo v. Gleaton*, No. 5:16-CV-153-F, 2017 WL 1102623, at *6 (E.D.N.C. Mar. 23, 2017) (internal quotations omitted) (quoting and citing *Cleavinger v. Saxner*, 474 U.S. 193, 201–02 (1985)). To determine whether an action is prosecutorial rather than investigative, "the key consideration is whether the action is 'closely associated with the judicial process.'" *Kline v. Cleveland Cnty.*, No. 1:19-CV-197-MOC-WCM, 2020 WL 1692348, at *7 (W.D.N.C. Apr. 7, 2020) (quoting *Burns v. Reed*, 500 U.S. 478, 495 (1991)).

Plaintiffs assert that Sparti "would not be operating a prosecutorial manner until there was a court order to remove the child." (Am. Compl. ¶ 3.) However, the Fourth Circuit has squarely recognized that social workers also act in a prosecutorial capacity in filing a removal petition—well before the court has ordered removal. *See Vosburg*, 884 F.2d at 137 ("[T]he filing of a removal petition is, in essence, the start of judicial proceedings against the parent or guardian of a minor child, and the duties of the social worker at that point are those of an advocate in that process."). And several courts have applied that principle to grant social workers absolute immunity from, for example, claims arising from any false allegations in the removal petition or associated affidavits. *See, e.g.*, *Rogers*, 2022 WL 1132153, at *9 ("The DSS

Defendants are entitled to absolute immunity for the filing of the petitions seeking custody of the minors, including for any false allegations contained in the petitions or fraud on the court related to the filing of the petition, its content, or in-court statements concerning the petition."), *report and recommendation adopted*, 2022 WL 851730, at *5 (E.D.N.C. Mar. 22, 2022) (finding that the magistrate judge "correctly applied the standard for qualified and absolute immunity" to the defendants); *Sahoo*, 2017 WL 1102623, at *6 (holding that a social worker was entitled to absolute immunity for intentionally misrepresenting facts in a petition or in testimony). *Nelson v. Green*, 965 F. Supp. 2d 732, 741 (W.D. Va. 2013) (holding that defendant social workers were entitled to absolute immunity for filing a removal petition, even if they misstated facts in their supporting affidavits or their testimony, but were not entitled to absolute immunity for investigative acts performed prior to that time).

This court understands *Vosburg*'s mandate similarly.  Thus, Sparti is entitled to absolute immunity from any constitutional claims relating to her filing of the removal petition, and the court must dismiss those claims.  This would include any malicious prosecution claims arising from the filing of the removal petition.  *Cf. Buckley v. Fitzsimmons*, 509 U.S. 259, 271 (1993) (explaining, in case where plaintiff brought malicious prosecution claims against prosecuting attorneys, that absolute immunity applied to prosecutor's actions that were functions "closely associated with the judicial process" ).

## IV.  CONCLUSION

For the foregoing reasons, the court will grant defendants' motion to strike (Dkt. No. 53), deny plaintiffs' motion for leave to file their second opposition brief (Dkt. No. 56), and grant in part and deny in part defendants' motion to dismiss (Dkt. No. 30).  The motion to dismiss will be denied as to plaintiffs' Fourteenth Amendment individual-capacity claims against Sparti and

Jarvis alleging interference with their right to care and custody of CMP and based only on events up until the time that Sparti filed a petition for removal in court.  It will be granted as to all other claims and granted as to Goss.  The court will issue an appropriate order.

Entered: September 29, 2023.

/s/ Elizabeth K. Dillon

Elizabeth K. Dillon
United States District Judge

27