CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VIRGINIA
FILED
December 08, 2025
Laura A. Austin, Clerk
By: s/ *Kelly Anglim*
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JESSICA NICOLE STOOTS, *et al.*, | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 7:22-cv-00196 |
| v. | ) |
| | ) By: Elizabeth K. Dillon |
| JORDAN SPARTI, *et al.*, | ) Chief United States District Judge |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiffs Jessica Nicole Stoots and John Lewis Phillips, proceeding pro se, filed this suit under 42 U.S.C. § 1983 after the Roanoke City Department of Social Services (DSS) effected an emergency removal of their infant daughter, "CMP." (Dkt. No. 3.) The court dismissed all but their claims against defendants Jordan Sparti and Allyson Jarvis, in their individual capacities, for their alleged interference, before they sought a court order, with Stoots's and Phillips's Fourteenth Amendment right to the care and custody of CMP. (Dkt. No. 62.) Sparti and Jarvis now move for summary judgment. (Dkt. No. 103.) The court has held a hearing (Dkt. No. 127) and considered the briefs (Dkt. Nos. 104, 111, 113). It has jurisdiction under 28 U.S.C. § 1331.

The court resolves this case on the second prong of the qualified-immunity analysis. In particular, because Sparti and Jarvis could not have known that their conduct would have violated any clearly established right of Stoots's and Phillips's, they are entitled to qualified immunity. For this reason, Sparti and Jarvis are entitled to judgment as a matter of law, and their motion for summary judgment will be granted.

I.  BACKGROUND

This much is undisputed.[1]  In March 2020, Stoots gave birth to CMP.  Phillips is CMP's father.  During her pregnancy, Stoots participated in a medication-assisted treatment program, so she and CMP tested positive for methadone at the hospital.  On March 8, a hospital case manager reported this positive testing to Roanoke City DSS, and Sparti, a Family Services Specialist, was assigned the investigation.  She immediately visited the hospital to interview Stoots.  After introducing herself, Sparti asked whether Stoots or Phillips had a history with child protective services, mental illness, domestic violence, or crime, and Stoots said they did not.

On March 9, Sparti checked this through Oasis, a statewide system that contains information about family assessments, investigations, and referrals.  She discovered that, in 2018, Pulaski County DSS had removed Stoots's and Phillips's older son because Stoots and Phillips had positive screens for amphetamines and/or methamphetamines and had found Phillips physically neglected another of his sons.  That day, she also learned that CMP had been diagnosed with neonatal abstinence syndrome, with elevated scores, and transferred to another hospital because of the diagnosis.

---

[1] (*Compare* Sparti Decl., Dkt. No. 104-1, *and* Jarvis Decl., Dkt. No. 104-2, *with* Hosp. Audio CD-ROM, Dkt. Entry Oct. 4, 2022, *and* Hosp. Audio Tr., Dkt. No. 28-1.)  Sparti's and Jarvis's declarations give the bulk of their side of the story, while Stoots and Phillips rely broadly on the "ironclad audio evidence" recorded at the time of CMP's removal at the hospital (Pls.' Opp'n 2, Dkt. No. 111).  Sparti and Jarvis likewise rely on the audio recording (Defs.' Mem. 7–8, Dkt. No. 104) and, at the hearing on this motion, encouraged the court to consider it and disclaimed any objection to Stoots's and Phillips's transcript of it.  All parties also relied on an emergency affidavit at the hearing (Dkt. No. 40-2, at 1–3), and Sparti and Jarvis did so in their brief (Defs.' Mem. 7–8, Dkt. No. 104). The above background is supported by these materials and not genuinely disputed by these or the other supportive materials the court has considered.  (*See* DSS Hist., Dkt. No. 104-3; Neglect Finding, Dkt. No. 104-4; Minor CRP Hist., Dkt. No. 104-5; Minor CLP Hist., Dkt. No. 104-6; Minor CNP Hist., Dkt. No. 104-7; Emergency Ord., Dkt. No. 104-8; Hosp. R., Dkt. No. 40-2, at 8; Physician Acceptance, Dkt. No. 40-2, at 9; Stoots Ltr., Dkt. No. 40-2, at 10; Phillips Ltr., Dkt. No. 40-2, at 11; Assessment Ltr., Dkt. No. 40-2, at 12; Interview Comment, Dkt. No. 40-2, at 13; Child Protective Services Handbook, Dkt. No. 40-2, at 14; Progress Note Mar. 12, 2020, Dkt. No. 40-2, at 15; Progress Note Mar. 13, 2020, Dkt. No. 40-2, at 16; Care Verification, Dkt. No. 40-2, at 17; Chattin Ltr., Dkt. No. 40-2, at 18; Phillips MCMI-IV, Dkt. No. 40-2, at 19; Emergency Pet., Dkt. No. 31-1, at 4; Prelim. Ord., Dkt. No. 312; Phone Tr., Dkt. No. 28-2.)  Much of this material is not authenticated, but Stoots and Phillips withdrew a motion in limine at the hearing (*see* Dkt. Nos. 127, 112), and the parties agree the court may consider it.  *See* Fed. R. Civ. P. 56.

On March 11, a relative of Stoots's told Sparti that she was concerned for CMP because Stoots and Phillips had a history of substance abuse, relatives had custody of their older son, and a protective order prohibited Phillips from contacting his other two sons. And, on March 12, Sparti called Pulaski County DSS, the Pulaski County Juvenile and Domestic Relations District Court (J&D Court), and Stoots's medication-assisted treatment center. At this point, Sparti and her supervisor discussed Stoots's and Phillips's histories with child protective services and drugs, and they considered, or conditionally decided on,[2] a safety plan to place CMP out of the home while the investigation continued.

On March 13, at about 10:22 a.m., Sparti visited Stoots, Phillips, and CMP at the hospital, explaining she was there because Stoots and CMP tested positive for methadone. Phillips responded that Stoots's medication-assisted treatment was legal. Sparti asked why Stoots had lied about her history with child protective services, and Stoots said she did not know what Sparti was talking about and would say no more without a lawyer.[3] Phillips explained he and Stoots had an unpleasant history with child protective services, including a similar episode with their first son and positive tests for prescribed substances, and he too would not speak without a lawyer. Sparti insisted that CMP was substance-exposed and requested that Stoots and Phillips take drug tests and mental-health assessments. Stoots remained silent, and Phillips made

---

[2] In her affidavit, Sparti asserts that she and her supervisor had *decided* at that point to place CMP out of the home until the completion of the investigation. Stoots and Phillips argue this is disputed, based on the audio recording of the later visit at the hospital, in which Sparti seems to suggest that they might be able to keep CMP if they complied with certain conditions. Although that evidence does not directly contradict Sparti's sworn statement, a reasonable jury could interpret her statements during that later interaction as indicating that no final decision had yet been made. Construing the facts in the light most favorable to the plaintiffs, the final decision was not made until after Stoots and Phillips refused to comply with the additional conditions.

[3] At the hearing, Stoots argued she had hemorrhaged so much in childbirth that, at their first interview, she could not have made the mental effort to lie to Sparti if she wanted to. Stoots also insists that Sparti's question was unclear about whether she meant past or present child-protective-services matters, and Stoots answered on the mistaken basis that she had no *active* matters. There are no facts in the record to support this argument, but it makes no difference here because it is undisputed that Sparti understood Stoots to deny any child-protective-services history.

3

clear they would not cooperate further without a lawyer, only adding they had nowhere else to send CMP.

At 10:29 a.m., Sparti left the room and called her supervisor, who sent Jarvis, a Senior Family Services Specialist, to help remove CMP. At 10:36 a.m., Sparti, now with two hospital police officers, told Phillips she would make the removal. Jarvis arrived at 10:50 a.m. She and Sparti said they were taking CMP because Stoots and Phillips declined to speak without a lawyer, refused to offer anywhere else to place her, and lied about their history with child protective services and drug use. Phillips maintained the removal was unlawful without an order signed by a judge or an exigency, and Sparti, Jarvis, and the police officers attempted to convince him otherwise. Jarvis explained the exigency lay in Stoots's and Phillips's prior child removal, prior positive drug tests, lie about past drug use, and refusal to offer another placement for CMP; Sparti repeated her statement that Stoots lied to her. Stoots and Phillips, waiting for a lawyer they found online to call back, objected strenuously at every turn and refused to give up CMP without legal counsel or a court order. Jarvis threatened to have the hospital police take CMP, and the police threatened to file charges. Amid the discussion, Stoots laid down CMP in her bassinet, and, at 10:57 a.m., someone reached around Stoots, grabbed CMP, and took her away while others moved to block Stoots and Phillips. Sparti gave Stoots and Phillips a removal notification.

At 2:35 p.m., Sparti swore out an affidavit and filed a petition for the emergency removal, and the Roanoke City J&D Court granted it at 3:30 p.m. On March 17, that court awarded temporary custody of CMP to Roanoke City DSS, but, on April 9, it returned custody to Stoots and Phillips. On April 28, Sparti, having found no physical neglect, closed her investigation.

4

## II.  LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists where the record, taken as a whole, could lead a reasonable jury to find for the nonmoving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  The court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."  *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  This must be a "*genuine* issue of *material* fact"; "the mere existence of *some* alleged factual dispute" cannot defeat a motion for summary judgment.  *Id.* at 247–48.  Where the party is pro se, the court should construe his or her contentions liberally.  *Sinclair v. Mobile 360, Inc.*, 417 F. App'x 235, 243 (4th Cir. 2011).

### B.  Substantive Due Process

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see* U.S. Const. amend. XIV, § 1.  But the state's interest in the safety of its children is also weighty, *Jordan by Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994), and its officials' judgments deserve "considerable deference," *id.* at 348.  So, where these officials deem a parent unfit to provide for his or her child, only their conduct that "shocks the conscience" offends substantive due process.  *D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016).

"Conduct that shocks the conscience encompasses 'only the most egregious official conduct'" and "lacks 'justification by any government interest.'" *Parker v. Henry & William Evans Home for Child., Inc.*, 762 F. App'x 147, 156 (4th Cir. 2019) (first quoting *Slaughter v. Mayor of Baltimore*, 682 F.3d 317, 321 (4th Cir. 2012), and then quoting *Hawkins v. Freeman*, 195 F.3d 732, 744 (4th Cir. 1999)). Mere negligence is never enough. *Id.* at 157; *accord Martin v. Saint Mary's Dep't Soc. Servs.*, 346 F.3d 502, 507 (4th Cir. 2003). "In cases such as this involving the warrantless removal of children, the emergency removal does not shock the conscience when it is 'based upon *some evidence* of child abuse.'" *Parker*, 762 F. App'x at 156 (emphasis supplied in *Parker*) (quoting *Weller v. Dep't of Soc. Servs. for Baltimore*, 901 F.2d 387, 391–92 (4th Cir. 1990)).

## C. Qualified Immunity

Where a social worker's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," she is entitled to qualified immunity. *Parker*, 762 F. App'x at 154 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). This immunity will lie unless (1) she violated a right and (2) "the right at issue, defined at the appropriate level of generality, was 'clearly established' at the time of the alleged misconduct." *Id.* (quoting *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 169 (4th Cir. 2010)). The court may exercise its sound discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first." *Id.* (quoting *Pearson*, 555 U.S. at 236). The official seeking the immunity bears the burden of proof. *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 219 (4th Cir. 2018).

A right is clearly established only if "[t]he contours of the . . . right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Renn*

*ex rel. Renn v. Garrison*, 100 F.3d 344, 349 (4th Cir. 1996) (quoting *Anderson v. Creighton*, 493 U.S. 635, 640 (1987)).  The court must take care to define the right at the "appropriate level of specificity," not at too "high [a] level of generality."  *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 539 (4th Cir. 2017) (alteration in *Booker*) (first quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999), and then quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  The key inquiry is whether "the law provided 'fair warning' that [the defendant's] conduct was unconstitutional."  *Id.* at 538 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

"[T]he right to familial integrity is 'amorphous' in many cases," *Martin*, 346 F.3d at 506 (quoting *Hodge v. Jones*, 31 F.3d 157, 164 (4th Cir. 1994)), and a social worker "will not be held liable for 'bad guesses in gray areas,'" *id.* (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).  "These types of decisions are precisely the sort that the doctrine of qualified immunity is designed to protect."  *White by White v. Chambliss*, 112 F.3d 731, 736 (4th Cir. 1997).

III.  ANALYSIS

Sparti and Jarvis argue they are entitled to qualified immunity, so they must show either (1) that they did not violate a right or (2) that the right, defined at the appropriate level of generality, was not "clearly established" at the time of the alleged violation.  *Parker*, 762 F. App'x at 154 (quoting *Doe*, 597 F.3d at 169); *see Wilson*, 893 F.3d at 219.  Their conduct fell along the "amorphous" reaches of Stoots's and Phillips's parental right, *Martin*, 346 F.3d at 506 (quoting *Hodge*, 31 F.3d at 164), so, in its sound discretion, the court starts and ends its analysis with the second of these prongs, *see Parker*, 762 F. App'x at 154.

When determining whether a right is clearly established, the court looks to cases of controlling authority—here, the Supreme Court and the Fourth Circuit.  *See Booker*, 855 F.3d at

7

538.[4] Stoots and Phillips have not cited, and the court has not found, any case that would clearly establish that the conduct of Sparti and Jarvis violated their substantive-due-process rights. Indeed, so far as the court is aware, the Fourth Circuit has never sustained a substantive-due-process challenge to an emergency child removal.[5]

Moreover, as the court discusses next, the precise contours of the right, as it might apply to the specific facts here,[6] have evolved over time and were not clearly established in the Fourth Circuit at the time of the events at issue. And there are several cases in which the circuit has held that there was no violation, on facts that were more egregious than the facts here, although one of the cases is unpublished. But neither the standards the Fourth Circuit has applied nor the facts in any of them would have provided "fair warning" to Sparti and Jarvis that their conduct was unconstitutional. *See Booker*, 855 F.3d at 538.

Controlling authority as of March 2020 established that a social worker's warrantless emergency removal of a child shocks the conscience, thereby violating a parent's substantive-due-process rights, if the social worker both (1) lacks "some evidence" to support the removal,

---

[4] The court also can look to decisions from the Supreme Court of Virginia, but it is unclear how that court's decisions "might clearly define federal constitutional rights," and the court does not need to address that in this case. *See Atkinson v. Godfrey*, 100 F. 4th 498, 501 n.7 (4th Cir. 2024) (noting same and taking same approach). Additionally, in the absence of decisions from the Fourth Circuit, the court may look to a consensus of decisions from other circuit courts. *Id.* at 501. But the Fourth Circuit does not want for its own decisions in this area of law, and other circuits have taken divergent paths. For example, some have used language sounding in the Fourth Amendment for their substantive-due-process inquiries. *See, e.g.*, *Hatch v. Dep't for Child., Youth & Their Fams.*, 274 F.3d 12, 22 (1st Cir. 2001); *Croft v. Westmoreland Cnty. Child. & Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997). The Fourth Circuit has never purported to take such an approach, and it would be inappropriate for this court to look so far afield here.

[5] *But cf. Doe*, 597 F.3d at 175 (announcing post-removal "duty not to make a foster care placement that is deliberately indifferent to the child's right to personal safety and security"); *Martin*, 346 F.3d at 507 (Traxler, J., dissenting) (opining qualified immunity should not lie where no evidence of abuse supported removal); *Weller*, 901 F.2d at 396 (holding failure to provide hearing promptly after emergency removal offended procedural due process).

[6] Throughout its qualified immunity analysis, the court refers to the "facts" of this case. These are the "undisputed facts and the facts considered in the light most favorable to" Stoots and Phillips. *Hensley ex rel. N. Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017); *Hicks v. Ferreyra*, 965 F.3d 302, 305 (4th Cir. 2020) (recounting facts "in the light most favorable to the plaintiff . . . , drawing all justifiable inferences in his favor").

*Weller*, 901 F.2d at 391; *see Parker*, 762 F. App'x at 156–57, and (2) acts intentionally wrongly, *see Martin*, 346 F.3d at 507; *Parker*, 762 F. App'x at 157.

In initially addressing cases arising in this context, the Fourth Circuit appeared to apply a "some evidence" test on its own, without any review of whether a social worker acted negligently, intentionally, or somewhere in between. *Weller*, 901 F.2d at 391. Then, in *Martin*, where all three members of the panel appeared to agree that there was no evidence to support the removal, the majority held that there had been no constitutional violation because there was no "intentional wrong-doing" by the defendants. *See Martin*, 346 F.3d at 506–07 ("Where a government official's act causing injury to life, liberty, or property is merely negligent, no procedure for compensation is *constitutionally* required." (quoting *Daniels v. Williams*, 474 U.S. 327, 333 (1986) (emphasis supplied in *Martin*)); *see also Parker*, 762 F. App'x at 157 (emphasizing that mere negligence could not shock the conscience).

Although the Fourth Circuit's subsequent unpublished *Parker* decision is not controlling for purposes of establishing what is clearly established law, *see deWet v. Rollyson*, 157 F. 4th 344, 352 (4th Cir. 2025), the facts are analogous and provide examples of types of conduct insufficient to shock the conscience. There, social services removed Parker's children on suspicion she had "a mental illness in which the sufferer may falsify symptoms of or intentionally cause an illness to her children." *Id.* at 151. A social worker in Clarke County came to suspect this "even though he never interviewed [Parker], reviewed fewer than twenty pages of the children's medical records, and had no mental health expertise." *Id.* at 157. Later, the family moved to Shenandoah County, where the children were diagnosed with a bacterial infection. *Id.* at 151. A doctor called the Clarke County social worker, who relayed his suspicion, and they both reported it to Shenandoah County DSS. *Id.* The children had been to

9

several hospitals, and, consistent with the social worker's theory, "in one instance there were no apparent medical reasons for their symptoms." *Id.* at 157. On receiving the report, Shenandoah County social workers "attempted two home visits" and "called the children's maternal aunt, who refused to give information," before removing the children without a court order. *Id.*

The Fourth Circuit held the Shenandoah County social workers had "some evidence" of child abuse, so their removal of the children, after the attempted home visits, did not shock the conscience. *Id.* at 156–57 (quoting *Weller*, 901 F.2d at 391–92). And the Clarke County social worker's actions were merely negligent or, at worst, "approached recklessness," so his actions also did not shock the conscience. *Id.* at 157. None of the social workers violated the Fourteenth Amendment. 762 F. App'x at 157.

*Parker* may be read to have treated the shock-the-conscience inquiry as having two components, only one of which a defendant need satisfy to establish compliance with substantive due process. That is, for a defendant like the Shenandoah County social workers—who had "some evidence"—there was no constitutional violation. And, for a defendant like the Clarke County social worker—who may not have had "some evidence," but who only acted negligently or, at worst, approached recklessness—there also was no violation.

Venturing further into the space between conduct "approach[ing] recklessness" and intentional wrong-doing, *Parker* suggested in dicta that if the defendant without "some evidence" had acted with "recklessness," it might have been sufficient to "shock the conscience." 762 F. App'x at 157 (stating that conduct approaching recklessness was insufficient to violate the Constitution but that reckless conduct "presents a 'closer call[]'" (quoting *Lewis*, 523 U.S. at 834) (alteration in *Parker*)). But even if *Parker* had so held, as an unpublished opinion, it would not constitute clearly established law, *see deWet*, 157 F. 4th at 352, and it could not modify the

10

standard set in *Martin*, which clearly established that only "intentional wrong-doing" might offend the right, 346 F.3d at 506–07.[7]

The two key inquiries in analyzing whether Sparti and Jarvis violated a clearly established constitutional right, then, are whether they had "some evidence" of abuse and whether they acted negligently, intentionally, or somewhere in between.  As the court explains next, a reasonable jury would have to conclude both that that they had at least "some evidence" and that they did not act intentionally wrongfully but, at worst, recklessly.  There is no controlling case holding (and not even *Parker* holds or even suggests) that a social worker *with some evidence* who acts recklessly by effecting an emergency child removal violates a parent's substantive-due-process rights.  Thus, they did not violate any clearly established constitutional right.

In concluding that a reasonable jury would be compelled to find they had "some evidence" of abuse, the court recognizes that a reasonable jury might find some of the evidence on which Sparti and Jarvis relied to be weak.  *See Henry*, 652 F.3d at 531 (casting evidence in "light most favorable to the nonmoving party").  For example, Stoots's compliance with her medication-assisted treatment program—which led directly to her and CMP's positive tests for methadone, the case manager's report, and CMP's diagnosis with neonatal abstinence syndrome with elevated scores—could reasonably indicate she was attempting to avoid illicit drugs, which a jury could reject as evidence of abuse.  And a reasonable jury might refuse to accord much significance to the couple's refusal to submit to tests and assessments without legal counsel.

But Sparti and Jarvis had other evidence here—as much as, if not more than, the workers in *Parker*.  The Shenandoah County workers there received two reports, attempted two home

---

[7] Again, while *Parker* does not inform what was clearly established law, the court nonetheless finds it helpful as a recent example of how the Fourth Circuit applies existing law to similar facts.

11

visits, and telephoned one uncooperative aunt, and, on a history of some social-services investigations and hospital admissions barely consistent with the reports, removed Parker's children. 762 F. App'x at 151–52, 156–58.

By contrast, Sparti interviewed Stoots twice and Phillips once before announcing her removal decision, and she thought Stoots initially lied about the couple's history with child protective services. When Sparti checked this history, it was disquieting: Less than two years earlier, social services had removed the couple's older son when plaintiffs tested positive for amphetamines (Stoots) and methamphetamines (Phillips) and had found Phillips physically neglected another of his sons. A relative shared with Sparti her concerns that the couple had a history of substance abuse, that they did not have custody of their older son, and that a protective order prohibited Phillips from contacting his other two sons. Sparti contacted the couple's medication-assisted treatment center and another county's social services and J&D court. And she conferred multiple times with her supervisor over the course of her six-day investigation. Jarvis, for her part, was entitled to rely on the conclusions of Sparti and her supervisor. The jury could not find, on this record, that Sparti and Jarvis did not have at least "some evidence" to remove CMP. *Weller*, 901 F.2d at 391.

There also is nothing from which a jury could find intentionally wrongful conduct by Sparti and Jarvis. Indeed, their conduct seems less reckless than the Clarke County social worker in *Parker,* who reported his suspicion after reviewing "fewer than twenty pages of the children's medical records," but who was found only to have approached recklessness. *Parker*, 762 F. App'x at 156–57.

Similarly, their conduct may have been less reckless than that of the *Martin* defendants, who allegedly told the Los Angeles Department of Child Services incorrectly that "emergent

12

circumstances existed" and that there was a court order for Martin's two children to be returned to Maryland.  346 F.3d at 503–05; *see* 346 F.3d at 512 (Traxler, J., dissenting) ("Everyone . . . agrees that there was no emergency.").  As a result, her children were forcibly removed and held overnight in Los Angeles.  *Id.* at 503–05 (majority opinion).  The majority there concluded that the removal "could have arisen from a misunderstanding."  *Id.* at 507.  There was insufficient evidence of any *intentional* misrepresentations, and "the defendants' conduct was no more than negligent conduct, if that," so Martin's claim could not be sustained, and the defendants were entitled to qualified immunity.  *Id.*

Unlike the defendants in *Martin*, there is no evidence that Sparti and Jarvis failed to consider the accuracy of the information that resulted in CMP's removal.  And the investigation on which Sparti and Jarvis relied was more thorough, and their choice to remove CMP was justified better, than the Clarke County worker's report in *Parker*.  Nothing suggests Sparti or Jarvis sought to punish Stoots for her prior drug use or compliance with the medication-assisted treatment program.  *See Martin*, 346 F.3d at 506–07.  A reasonable jury might find that Sparti and Jarvis were, at worst, reckless to remove CMP.  But even if they did act recklessly, it was not clearly established in March 2020 that acting recklessly, but with some evidence of abuse, would violate Stoots's and Phillips's parental right against warrantless child removal.

Two further points suggest that Sparti and Jarvis did not offend a clearly established right.  First, when Sparti and Jarvis removed CMP, the Virginia state courts had "upheld an adjudication of a newborn child abused or neglected, before the child ever left the hospital with her biological mother, based, in part, on previous findings of abuse or neglect of the mother's three other children."  *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 719 S.E.2d 329, 349 (Va. Ct. App. 2012) (citing *Jenkins v. Winchester Dep't of Soc. Servs.*, 409 S.E.2d 16, 19 (Va. Ct. App. 1991)).

13

Second, following CMP's removal, the Roanoke City J&D Court issued an emergency order to remove her and preliminarily awarded temporary custody of her to Roanoke City DSS. These are fair hints that a reasonable social worker would not have known her removal violated any clearly established standard.

Stoots's and Phillips's other arguments also fall short. *See Sinclair*, 417 F. App'x at 243. They stress that CMP was safe in her mother's arms at a hospital when Sparti arrived for her. But she was due to be discharged in the next day or so, and Stoots's and Phillips's clearly established right did not require Sparti and Jarvis to wait for the threat of her discharge—to an environment they thought, on the strength of some evidence, might be unsafe—to become still more urgent. *See D.B.*, 826 F.3d at 741; *Jordan*, 15 F.3d at 348–49. Stoots and Phillips seem to suggest that Sparti and Jarvis failed to satisfy section 63.2-1517 of the Virginia Code, which authorizes a warrantless removal where continuing in a parent's care or custody "presents an imminent danger to the child's life or health to the extent that severe or irremediable injury would be likely to result" and "[a] court order is not immediately obtainable." But "[a] Virginia statute is not the Constitution," so it cannot control substantive due process. *Paton v. City of Norfolk*, No. 24-1988, 2025 WL 1752497, at *4 (4th Cir. June 25, 2025).[8]

Stoots and Phillips also urge that positive tests for prescribed methadone should not lead to removal of a newborn infant. But, as the court explains above, even if a reasonable jury were to agree with them, the undisputed fact remains that Sparti and Jarvis had "some" other evidence to remove CMP, *Weller*, 901 F.2d at 391, and nothing in the record shows their motivations were

---

[8] The court does not understand Stoots and Phillips to argue procedural due process, which "runs to court proceedings provided under state law and not to the discretionary discharge by DSS of its duties." *White*, 112 F.3d at 736. In any event, the principles expounded in *Mathews v. Eldridge*, 424 U.S. 319 (1976), not the Virginia Code, govern the constitutional adequacy of child-removal proceedings. *See D.B.*, 826 F.3d at 741–43; *Weller*, 901 F.2d at 394. And the Fourth Circuit has held Virginia's statutory scheme to satisfy procedural due process. *Jordan*, 15 F.3d at 345–51 (approving of delay between removal and judicial review).

14

impermissible, *see Martin*, 346 F.3d at 506–07; *Parker*, 762 F. App'x at 156.  Stoots's and Phillips's remaining points—that Stoots never lied, that their histories were too innocuous or distant to bear on their fitness to raise CMP, and that Sparti should have known their concerned relative was a vindictive busybody—either lack support in the record or otherwise do not create a dispute of *material* fact because they would not affect Sparti's and Jarvis's entitlement to qualified immunity.  *See* Fed. R. Civ. P. 56(e)(3); *Anderson*, 477 U.S. at 247–48.  The court has considered them all liberally and in their best light, *see Sinclair*, 417 F. App'x at 243; *Henry*, 652 F.3d at 531, but they create no genuine dispute of material fact.

Sparti and Jarvis were not on fair notice that their removal of CMP—on some evidence, no worse than recklessly—might violate Stoots's and Phillips's constitutional right to the care and custody of CMP.  So, even if they offended the Fourteenth Amendment, Sparti and Jarvis could not reasonably have known it, and they are entitled to qualified immunity.  *See White*, 112 F.3d at 736.

## IV.  CONCLUSION

The court does not doubt the trauma this episode visited on Stoots and Phillips.  But the materials in the record raise no genuine dispute that Sparti and Jarvis had some evidence, and were no worse than reckless (if that), to remove CMP, so they did not violate Stoots's and Phillips's clearly established right to her care and custody.  Therefore, Sparti and Jarvis are entitled to qualified immunity and to judgment as a matter of law.  Their motion for summary judgment will be granted (Dkt. No. 103), and the court will enter final judgment in their favor.  A consistent order will be issued.

Entered: December 8, 2025.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
Chief United States District Judge

15